We will hear argument this morning in Case 24-621, National Republican Senatorial Committee v. Federal Election Commission. Mr. Francisco. Mr. Chief Justice, and may it please the Court. The coordinated party spending limits are at war with this Court's recent First Amendment cases. The theory is that they are needed to prevent an individual donor from laundering a $44,000 donation through the party to a particular candidate in exchange for official action. But that Rube Goldberg theory fails for the same reasons this Court rejected it in McCutcheon. First, it's unlikely to work, because the donor has to cede control of his money to the party committees, which have their own interests. Second, it's already prevented by other things, including the $44,000 base limit, the earmarking rule, disclosure requirements, and the bribery laws. And third, there's no need for it, since a would-be briber would be better off just giving a massive donation to the candidate's favorite super PAC. That's why no one has identified a single case in which a donor has actually laundered a bribe to a candidate through a party's coordinated spending, even though 28 states allow it. All this is why my friend tries so hard to argue that this case is moot. But that fails, too. He has to show that it is impossible to grant either Vice President Vance or the committees any effective relief. But there's no evidence that the Vice President has abandoned his intention to run for federal office in 2028. To the contrary, he has an active Statement of Candidacy, an active Senate Campaign Committee that's already raised $50,000 in this year alone, and at least 15 of the last 18 Vice Presidents have gone on to run for the presidency. And regardless of the current executive's views of the First Amendment, it would be insane for Vance or the committees to knowingly violate this law, since it is a criminal statute with a five-year statute of limitations. So this case remains alive and well. I welcome this Court's questions. Well, Mr. Francisco, the RNC is not here. I think you would have to explain why the Republican groups here set the bill of a national party. Well, for a couple of reasons, Your Honor. I think, first of all, I actually think you can set the committees entirely to the side and focus just on Vice President Vance. And I take it your question is addressing 30110. So I'd like to explain that. The Sixth Circuit plainly had both Article III jurisdiction and statutory authority at the time it ruled solely with respect to Vice President Vance. When the Sixth Circuit ruled, the Vice President had not yet been elected to the vice presidency. He was still a sitting United States senator. So even under my friend's position, he would be within the Article III jurisdiction of the Sixth Circuit. I'm comfortable with him. It's the committees that I was interested in. Oh, sure, sure. And I can get to the committees. Just to finish up that point, I think even if you didn't have the committees here, you would have jurisdiction solely with respect to Vice President Vance. Now, as to the committees, the first point I would raise is that they waive this issue. The first sentence of 30110 simply sets forth the cause of action. As then-Judge Kavanaugh made clear in his dissent in the grocery manufacturer's case on the D.C. Circuit, which this court later adopted, that can be waived. But even if you turn to the text and look at what it means to be a national committee of a political party, this text makes quite clear that that phrase includes the national congressional campaign committees. And it doesn't matter whether it begins with the word a or the word the. If you look at, for example, the 2018 amendments, they repeatedly refer to a national committee of the United States as including the national congressional campaign committees. And if you look at the BICRA amendments that were added in 2002, and specifically I point you to 30125B2B42, that's a mouthful, it specifically refers to the national committee of a political party as including a national congressional campaign committee. But I think my more important point is, you could disagree with me on everything that I said with respect to the national committees. The Sixth Circuit plainly had jurisdiction over Vance at the time that it ruled. Now that we're in this court, 30110 doesn't really matter, because it doesn't apply to you. All that matters in this court is that you have jurisdiction under the certiorari statute, which you plainly do, and Article III jurisdiction over the case, which you do not only with respect to Vance, but also with respect to the committees who are also being harmed by the statute. So with respect to the vice president, what does he mean when he says, in effect, that it was way too early to decide whether or not to run? Your Honor, I think that what he is doing is what virtually every candidate for the presidency does, is wait until after the midterm elections in order to announce his specific intentions. But I think it's important to remember here that the question is mootness. And when it comes to mootness, they bear the burden of showing that it's impossible to grant any relief. So they have to show that Vice President Vance has actually abandoned his intentions to run for federal office. But here, we know a few things. We know he's got an active statement of candidacy and an active Senate campaign committee that's not sitting around doing nothing. It's raised $50,000 this year alone. We also know that virtually every vice president goes on to run for the presidency, particularly young ones like Vice President Vance. And with respect to my friend, this court doesn't have to blind itself to the reality that's obvious to everybody else. It's important for you to draw a distinction, isn't it, between coordinated expenditures and actual contributions? And if so, how do you tell that? It seems to me that that's kind of a fiction, that they're just coordinated expenditures. They're not making direct contributions. I don't know in substance what the difference is. Well, Your Honor, when it comes to coordinated expenditures, for example, when we run an ad using coordinated expenditures, it actually has to say paid for by the Republican Party, paid for by the National Republican Senate Campaign Committee. So it is very much our speech. Well, I guess what I would say is you've identified the fiction. In other words, you see the candidate is giving speeches on opposition to a particular farm subsidies or whatever, and then you can start engaging in speech on that same platform, that same priority. And I don't see that there's much difference between giving him the money to let him do it and doing it yourself in the practical, if not legal, coordination. And that's my second point, which is it doesn't really matter. I can assume for the sake of argument that in theory a coordinated expenditure can be roughly the equivalent to a contribution. The difference here is the theory of corruption. When I make a direct donation to a candidate, I can bribe the candidate in exchange for that contribution. I can also say to the candidate, if you engage in official action for me, I will spend money on your behalf. That's not their theory when it comes to coordinated spending. Nobody is arguing that the party is trying to bribe the candidate. Instead, the theory here is that the donor is trying to bribe the candidate through the party by using the party as its mule in the form of coordinated expenditures. That's the type of conduit bribery that this court addressed in McCutcheon when you said it was unlikely to work, it's already prevented by other things, and there's no need for it given the rise of super PACs. Why do that rather than just cutting a million-dollar check directly to the candidate's favorite super PAC? Which I think is why they have no evidence this has ever occurred. The FEC actually had an expert below. Why do that is that the super PAC can't be coordinated, and these party expenditures can be coordinated, so they're more helpful to the candidate because for the reason that the Chief Justice said, they effectively function as contributions to the candidate. There can be coordination to the max so that everything that the candidate would want is done through these coordinated contributions, and that's more valuable to a candidate than giving money to a super PAC that is generally on the same page that may do things that the campaign actually doesn't want done. Except that a contribution to a party is limited to $44,000, whereas a contribution to a super PAC is unlimited. I think— $20,000, and then you give to the joint committee, and then the joint committee disperses it, and then it comes back, and it ends up in the party, and all together, it's not just the $40,000 plus the $3,000. It's probably about a half million, even putting aside the segregated accounts, plus the $3,000. So you've taken a base limit of $3,000, and you've amplified it into a half-million-dollar contribution, which is going to exactly what the candidate would put it to himself. So two responses, Your Honor. The first is what I was initially giving you, because, yeah, I recognize the hypothetical you're drawing out, but super PACs have unlimited contributions, and I would much rather have $10 million of independent spending if I were a candidate than even $44,000 or even $500,000 of coordinated spending. I think you addressed this issue in McCutcheon, but I'll put that to the side, and I'll take on your hypothetical directly. First of all, again, I think McCutcheon answers this, because McCutcheon directly addressed the joint fundraising context, and it rejected it, making quite clear that joint fundraising wasn't a mechanism for evading the base limits or the ear-marking rules. But I'd also say, think about how— But, Mr. Francisco, even in rejecting the mechanism, even in saying that the mechanism at issue there was okay, one of the things that the court said in McCutcheon was that these limits actually served to mitigate any problems that you would have from the aggregation limits that were at issue there. So it clearly conceived of a world in which these campaign-coordinated limits would be in place. Sure, but I think that the joint fundraising theory that my friends lay out in their briefs is the same highly implausible theory that this court rejected in McCutcheon. Think about how it works. I donate to 20 different committees, political committees, candidate committees. All of those committees then agree to transfer all of that money to one committee. That one committee then agrees to spend all of that money for one candidate, all so that one candidate can deliver official action back to me. If this were a real problem, you'd think that they'd have evidence of it occurring one time in all of American history, yet they don't. The reason they don't are the reasons you gave in McCutcheon. And in addition, why would I go through that circuitous scheme rather than just give— call it $1 million, call it $10 million, call it $100 million to my candidate's favorite super PAC, which again is the issue you addressed in McCutcheon. I keep saying there's no evidence of this kind of coordination resulting in a quid pro quo or the appearance thereof. But the whole campaign finance board law is based on just such an evidence. In the early 1970s, that's what led to all of this congressional action. The dairy industry channeled millions of dollars to President Nixon through the Republican Party and its committees. The industry landed $100 million subsidy from President Nixon in return. Was there a quid pro quo? There certainly was an appearance of quid pro quo. That's what started the entire campaign finance reform legislation. The threat hasn't diminished. One impetus behind the bipartisan campaign reform act, the more recent one, was to address how donors were funneling soft money to national parties that those parties would then use to benefit federal candidates, to national parties. There was ample evidence, and I'm citing from our own case law on this, about how parties were willing intermediaries. The evidence of McConnell showed that this circumvention was effective. Donations from the tobacco industry to Republicans scuttled tobacco legislation, just as contributions from trial lawyers to Democrats stopped tort reforms. And in Colorado, too, this court cited the tallying scheme used by the DNC. That was an informal agreement between the DNC and candidates, in which candidates encouraged donors to give to that party with the tacit understanding that the party would funnel that contribution back to the candidate through coordinated expenditures. I don't understand how you can say there's a lack of evidence. It's replete in all of our cases and in the history. And if there's not direct evidence, it's because our umbrella is working. Your party said to us that we did not have to worry about independent expenditures at a limit, because we had laws that stopped coordinated contributions. So what you told us was the prophylactic that was enough for us to rule in favor of unlimited expenditures. You now want to take that umbrella completely away. That's your point. So, Your Honor, there's a lot in there, and to unpack it a little bit, I think where I'd start is the FEC actually had an expert below and built a record, and the FEC's own expert conceded that none of the examples that he had or any of the other historical examples actually involved coordinated party spending. So there's no example of coordinated party spending ever being used. Because it hasn't happened. We've been prohibiting it since Buckley. And, Your Honor, that is my second point. We actually have 28 states in this country that impose no limits on a party's ability to coordinate with its candidates. None. We don't have any example from those 28 states. We have the 2014 amendment, which tripled the size of the base limit for certain types of contributions, completely excused it from coordinated party expenditures. We have absolutely zero examples of coordinated party spending in that context being used for quid pro quo bribery. We also have existing law that allows $44,000 contributions to us, which can be coordinated in amounts ranging from $60,000 to $4 million, depending on the race. The number of examples of the type of quid pro quo conduit bribery they're concerned about in that context, zero as well. Thank you, Counsel. Justice Thomas, Justice Alito? This is a question I will ask you and Mr. Elias, and it has to do with who is helped and who is hurt by the provision that is before us. In our much maligned, I think unfairly maligned decision in Citizens United, the effect of the provision at issue was to privilege certain corporations, namely the corporations that control all of the national media and disadvantage other corporations like Citizens United, and the effect of our decision was to level that playing field. Here, it is not apparent to me who is benefited by this provision and who is disadvantaged by the provision, and I would appreciate your enlightening me on that. Sure. I think one thing that we have seen as a result of this provision, and this is actually a point that is embraced by many of those who are actually in favor of very robust campaign finance reform, it's the idea that the relative power of the super PACs has increased dramatically and the relative power of the political parties has been diminished as a result. I think you'll see in the materials graphs that show how the changes in spending have gone over time, and what you've seen is an explosion in the size of super PACs, whereas the spending of the political parties has been relatively minimal. And we think that that actually has many dangers to our democracies. Political parties serve a moderating influence by forcing essentially compromises within a party in order to put forward a platform and to put forward candidates, whereas PACs and super PACs can often be focused on narrower issues. So to me, that's one of the big sets of winners and losers that have resulted. We think by invalidating the coordinated party's expenditure limits, you start to restore the political parties to the relative political power that they've ultimately had, which I think is ultimately to the benefit of democracy itself. Well, you represent a political party and the intervener respondents represent a political party, and I know you're both here simply making arguments that you think will advance the public good, but I wonder whether there is a reason why you have provided an argument in support of, in defense of the role of political parties, but both you and the intervener respondents represent political parties, so that doesn't quite answer my question. Sure. Historically, we've been aligned on this issue. The two political parties have been aligned on this issue. Historically, both of the parties have resisted these types of incursions into their own ability to engage in free speech. I'm going to venture into the realm of speculation here, Your Honor, to answer your question, because I don't think the record actually really does answer your question, but I think one answer might lie in the fact of where the different parties' relative fundraising strengths have been over the years. Over the years, I think that there's some sense that the Republican Party apparatus is raising more money relative to the candidates, whereas within the Democratic apparatus, the candidates are raising more money relative to the party apparatus. If that is true, you could understand why one party might favor more robust party structures than the other party less so, but I am absolutely not relying on that. I'm relying on the same free speech principles that in the past we and my friends on the Democratic side have been locked in arms on in defense. Thank you. Justice Sotomayor? Your answer is suggesting to me that every time we interfere with the congressional design, we make matters worse. You're telling us that Citizens United and McCutcheon ended up, yes, in amplifying the voice of corporations, but diminishing another voice, that of the party. Now you want to now tinker some more and try to raise the voice of one party. Our tinkering causes more harm than it does good. Your Honor, I personally never think free speech makes things worse. I think it virtually always makes it better. So you think it's okay from McCutcheon that in the 2016 election, Hillary Clinton set up a joint victory fund with the DNC and 32 state parties, which allowed a single donor to give up to $356,000. That's quite a difference from the individual limit. In 2024, Donald Trump's campaign launched a joint fundraising operation with his own leadership pack, the RNC, and 40 state Republican parties, committees, that sought donations of up to $814,600. And because of the disclosures, he knows exactly who gave all that money. I'm not picking on Donald Trump. Joe Biden's victory fund, together with the DNC and the party committees of all 50 states, raised up to $1.3 billion. And now you want to say we want to take, because once we take off this coordinated expenditure limit, then what's left? What's left is nothing. No control whatsoever. So, with all respect, Your Honor, I don't have a problem with the various statistics you just cited in the absence of any evidence or any suggestion it was ever tied to quid pro quo corruption. And that is the teaching of this case. More speech is always better than less speech. I would suggest that the fact that one major donor to the current president, the most major donor to the current president, got a very lucrative job immediately upon election from the new administration, does not give the appearance of a quid pro quo. Your Honor, I'm not 100% sure about the example that you're looking at. But if I am familiar, if I think I know what you're talking about, I have a hard time thinking that his salary that he drew from the federal government was an effective quid pro quo bribery, which may be why nobody has even remotely suggested that. Maybe not the salary, but certainly the lucrative government contracts might be. Justice Kagan? I'm wondering, Mr. Francisco, whether your answer to Justice Alito didn't contradict, or at least is in tension with your answer to me. Because when I talked to you about some of the dangers that taking off these expenditure limits would have, you said, no worries, because really everybody's just going to continue to contribute to super PACs. That's really the way to favor a candidate. But to Justice Alito, you said, no, this is going to reshape the balance between super PACs and parties. And I'm inclined to say that you can't have it both ways. So, Your Honor, I think that what I was getting at in response to your question, if I wasn't clear, maybe I can clarify it now, is that there's not the risk that somebody is going to try to launder a bribe through the party to the candidate in exchange for official action, particularly when that so-called bribe is capped out at $44,000. Which is really not $44,000. When they can call it $500,000, call it whatever you want through this very circuitous... Well, $500,000, that's a lot more than $44,000. Through this very circuitous joint fundraising operation that has never occurred in the quid pro quo tradition. Nobody seems to find this circuity all that difficult to deal with. At this point, all of these committees are in constant communication with each other and funnel money back and forth without any difficulty. Because, you know, once you have the joint fundraising committees in place, this is not very difficult. And then you would think that if it were so easy and it were so common, it would be fairly easy to find at least one example in all American history to find where it has been used to effectuate this type of quid pro quo conduit bribery. Yet there is none, not in that context, not in any other context, even though there are lots of laws that will allow that type of scheme if you wanted it. Let me ask you another question, which is, on your theory, as I understood your theory, if you took everything that you said to me about why we shouldn't worry about, and to the Chief Justice, about why we shouldn't worry about these limits, I would think that that would apply just as well if it was another kind of group rather than a party that was coordinating with the candidate, or indeed if it was an individual coordinating with the candidate. Why wouldn't everything you say apply to individuals and private groups, such that now, rather than telling those individuals you can go contribute to a super PAC or do your own independent expenditures, but no, you cannot coordinate with the candidate for more than $3,300. Now you can. And it's all of the reasons that this court gave in McCutcheon why this type of conduit bribery scheme is less of a risk than a direct bribery scheme. No, I understand that that's your argument, and what I'm asking you is that that argument applies just as well if, instead of a party, we substitute another group or an individual. Oh, I very much disagree with that, Your Honor. If I'm an individual and I want to directly bribe a candidate, I can say to the candidate, I will either give you $50,000 cash, $50,000 donation, or spend $50,000 on your behalf. I am directly bribing that candidate with whatever benefit I'm offering. With conduit bribery scheme, you by definition don't have that direct relationship between the donor and the candidate. Yeah, boy, you are assuming a lot there about people's, honestly, dumbness. I mean, everybody knows where the money is coming from when it's done this way. So the fact that I have a party as a conduit, the fact that I have a different private group as a conduit, it's not hard to figure out where the money is coming from, either for that person, the original source of the money, or for the candidate. And all I'm suggesting to you is that if your argument sort of depends on, in fact, this is very complicated, people don't do this, you know, you have to devise a flow chart to see how it works, I can be skeptical of that, but even if I put that skepticism aside, it would apply just as well to a conduit that was not a political party, to a conduit that was another private group, or indeed to, you know, an individual. So two responses to that, Your Honor. The first is that I think I'm simply assuming, whether it's dumb or not dumb, I'm simply assuming the same chain of reasoning that this Court adopted in McCutcheon when it explained that the risk of conduit bribery was not nearly as significant when you had the party standing in front of the donor. See, I don't agree with that. I think that McCutcheon says, you know, I was on the other side of McCutcheon, but McCutcheon says, we take these circumvention rationales seriously. Now, they said there was no reason to fear circumvention there, but the entire thrust of the opinion was, if you could show us that this was a way to circumvent the base limits, that would be a reason to keep these limits in place. And then, in evaluating why the aggregate limits were not necessary in order to further anti-circumvention goals, the Court specifically pointed to this limit as part of the status quo that would prevent circumvention. So, Your Honor, maybe we just have different readings of McCutcheon, but I'm relying on the statement, for example, where McCutcheon said there is not the same risk of quid pro quo corruption or its appearance when money flows through independent actors to a candidate as when a donor contributes to a candidate directly because the Court explained when an individual contributes to a party committee, the individual must, by law, cede control of the funds. And then the Court went on to cite the Assistant Attorney General's testimony about how there should be, quote, fewer cases of conduit contributions directly to parties because donors who wish to influence elections or officials will no longer need to attempt to do so through conduit contribution schemes that can be criminally prosecuted. Instead, they are likely to simply make unlimited contributions to super PACs. So that's the portion of McCutcheon I'm relying on. I actually think that, you know, I fully understand and appreciate the concerns that you're raising, but I don't think that they're tied to quid pro quo corruption. I think they're tied to a broader understanding of a corruption that was adopted by the McCutcheon dissenters where it wasn't simply limited to quid pro quo corruption, but rather the corrupting influence that many believe that money can have in politics. You have assumed that that ship has sailed. All of my questions to you have assumed that what we're doing is preventing quid pro quo corruption, and the portions of McCutcheon that I could cite back to you are the portions that make it quite clear that if there's a limit that is necessary to prevent circumvention of the base contribution limits, that that is a reason to have that limit. Well, respectfully, I think McCutcheon would have come out the exact opposite way in that case because that was the whole point of the idea. I think that the point of McCutcheon was that they didn't need, in those particular circumstances, with respect to aggregate limits, that there wasn't a circumvention problem. But that is not to say that in these particular different circumstances with these limits, which indeed McCutcheon specifically pointed to, that there's also not a circumvention problem. There is, because of this thing that we started off with, with the fact that coordinated contributions, you might as well just be giving money to the candidate. McCutcheon pointed to Colorado II, I think, once when it was batting down the barrage of hypotheticals that were asserted by the dissent in that case. But I think that the thrust of the reasoning of McCutcheon is that if you have an implausible theory and zero evidence to back it up, that's generally not going to be a strong First Amendment case. Here you've got the same implausible theory that you had in McCutcheon, the kind of conduit bribery scheme, and they've got zero evidence to back it up. I simply don't see how you can hold up Colorado II and McCutcheon side by side and say that both were correctly decided. Thank you. Justice Gorsuch? Justice Kavanaugh? Just to start, I am concerned, as you said, that the combination of campaign finance laws and this Court's decisions over the years have together reduced the power of political parties as compared to outside groups with negative effects on our constitutional democracy. So I start from that, and I'm trying to figure out how this case fits into that with respect to political parties and the strength of political parties. On the other hand, I'm also concerned, of course, about quid pro quo corruption and the circumvention concerns. And one of the things that I think you rely on pretty heavily are the earmarking rules to prevent the circumvention in this case. Now, the other side and a lot of the amici say the earmarking rules are really pretty toothless in practice and really don't do much, and this picks up on some of Justice Kagan's concerns as well. They reach only the most clumsy efforts to pass contributions to candidates. It's difficult to police. Donors rarely need to explicitly earmark to accomplish their goals. So if earmarking's a key to the quid pro quo corruption piece of this, how can we be sure that those are actually going to do much in the real world? Sure, and what I would say is earmarking is one part of it, and violating the earmarking rules is, I believe, a crime. But I think it's important to understand where it fits within the mosaic and why there are multiple prophylaxes here that are aimed at preventing the type of quid pro quo corruption at issue here. I start out with the fact that the money has to actually go through the political party. So the donor who's trying to bribe a single candidate has to go through the party who's trying to get elected lots of candidates and hope that the party spends that money on behalf of the candidate that the donor is trying to bribe. That's prophylaxis one. Prophylaxis two are the base limits. The most they can contribute to the political party is $44,000. Can I stop you there? Do you think those limits are constitutional? I assume you think they're not constitutional. Your Honor. And that in a future case, kind of how this march has proceeded, that you would argue those limits on parties are not constitutional, so as, to get to my first point, to equalize the strength of political parties and outside groups. That's the real source of the disadvantage, right? You can give huge money to the outside group, but you can't give huge money to the party, and so the parties are very much weakened compared to the outside groups. So to cite that as a prophylaxis, I'm not sure five years from now, three years from now, how that will look. Well, Your Honor, what I can say is that we are not here challenging that limit, and under Buckley and the longstanding notion of that. Do you think it's constitutional? Your Honor, I don't have a position on whether it's constitutional or not. I'm willing to assume for the sake of argument here that it's constitutional, but it's still only the second of the two. You're not going to want that cited back to you in a couple of years. Assume for the sake of argument. Okay, that's all right. The third thing I'd point to after that is the earmarking rule, and it's actually a crime to violate the federal earmarking rules. The fourth thing I'd cite to you are the disclosure requirements, which allow the FEC and the public to follow the money to figure out if something nefarious is going on. The fifth, of course, is the bribery laws, which make all of this a crime. So this isn't an example of one prophylaxis, but it's five, probably I could come up with others, prophylaxes on top of one another. And if you kind of put it all together, suppose that a donor does want to bribe a particular candidate by going through the party in coordinated spending. It's got to hope that the party is going to spend that money on behalf of the candidate when the party's got a much broader set of interests. Lots of candidates are running unopposed, or they have very little chance of winning, or they're just generally in safe seats. Parties don't want to spend money on behalf of those candidates. So if I'm trying to submit a bribe to bribe that candidate, it's not likely going to get through to the candidate at the end of the day. And if it does, it's going to be pretty blazingly obvious. Why on earth is the party spending all of this money on behalf of a candidate who's in a safe seat or who's running unopposed? That's when the disclosure requirements kick in. That's when the FEC kicks in. That's when the bribery laws come together. I take that having sometimes. I mean, sometimes it's pretty obvious, though, I think, in the real world, and I think you would acknowledge that, too. But I'll stop there. Thanks. Justice Barrett? Justice Jackson? I have a couple questions. One is just I'm just trying to get a clear answer on whether or not your client is going to come back and attempt to suggest that the guardrails that would still exist will no longer exist in the future. What do I mean by that? In McCutcheon, your clients filed a brief saying that the sky wouldn't fall if the court struck down aggregate limits because we still have coordinated expenditure limits. And now here we are today with your client saying no more coordinated expenditure limits. And so I'm wondering if, and I think others have raised that concern as well, we're going to be back here with the other kinds of limits, with you making the same kinds of arguments. Well, Your Honor, I think different limits are on stronger footing than others. I am not going to say that my clients are not going to come back and try to challenge other limitations. I think it's well known that we have discomfort with different parts of the campaign finance law. I understand. What I am saying is that that's not what we're challenging here. I appreciate that. But how can your argument be today that these limits can fall and it will be okay because the other limits exist if you can't make a representation that we're still going to have those other limits? I mean, we're trying to prevent the kind of circumvention that would indicate or allow for quid pro quo corruption. I think everybody is in agreement on that. And to the extent that you say these kinds of limits aren't going to be a problem to get rid of them, that's because these other guardrails exist, right? I think I can do that in two ways. The first is just through a very straightforward application of McCutcheon. I think you can just march through the analysis of McCutcheon, do nothing further, and say that this is incompatible with McCutcheon. But McCutcheon was aggregate bans that functioned as expenditure limits, right? McCutcheon was a different set of circumstances. Well, actually, McCutcheon was a true contribution limit. And that's why I actually think this is an easier case than McCutcheon and an easier case than Cruz. They're concerned about the dominoes falling forward. To me, this is an example of the domino falling backward. I just don't see how this can stand alongside of McCutcheon. The second point that I would make, though, is I could eliminate the base limit issue that Justice Kavanaugh and I were just talking about. And I'll say, look, I'll put that to the side. I'm perfectly happy to rely on the fact that a would-be briber has to assume that the party is going to do its bidding as part of the bribery scheme here, that the earmarking rule is going to kick in, that the disclosure requirements are going to kick in, that the federal bribery laws are going to kick in. I think that those four prophylaxes would be fully sufficient, only apart from the base limit. Right, but I guess my argument is if we didn't have those other things, would you be making the same argument? Your Honor, I might, but I certainly don't need to, given that we have all of these other things. By definition — You're not even committing to not challenging them in the future. By definition, coordinated party spending requires the political party that's standing in between the donor and the recipient of the bribe to be in cahoots on the crime. I guess I am willing to assume that the bribery laws aren't going to go away. I can't imagine that Congress is going to eliminate the bribery laws. So, frankly, I would be making the argument if I had only those two prophylaxes, but I have multiple ones in addition. Let me ask you about the record upon which we found in Colorado II that there was circumvention happening, that it was likely to happen in the absence of these kinds of limits. Are you prepared to represent that the record that we considered in Colorado II is no longer sound? I don't think I have to say that that record is no longer sound, because I think the problem in Colorado II was the legal standard that applied. Colorado II defined corruption so that it wasn't limited to quid pro quo corruption, but instead included the so-called corruption caused by influence and access in politics. If you accept that as a definition of corruption, then I think that the record in Colorado II arguably does satisfy that standard. It's just that this Court has repeatedly rejected Colorado II's understanding of corruption. So what is the implication of that now? I guess I'm just trying to understand what factual basis we have right now to make a determination as to the impact of the rise of super PACs and the advancements in disclosure technology. These are things that you say have happened subsequently post-Colorado II that should make a difference in how we view the likelihood of quid pro quo corruption. I just don't know that we, in the first instance, can make that sort of determination. Don't we have to have some sort of record to determine how super PACs are actually operating and engaging with contributions so that we can have something to base our determination on? Well, we do have a record in this case, Your Honor. And what this record shows is that 28 states impose no limitations on a party's ability to coordinate with its candidates. Yet there's not a single example of the type of conduit bribery they're concerned about arising in those 28 states. We have the 2014 amendment, which tripled the size of the base limit for certain purposes, completely eliminating the coordination requirements. No example of a single instance of quid pro quo conduit bribery in that context. We've got existing law, which allows $44,000 contributions to the party, which can be coordinated in amounts ranging from $60,000 to $4 million, depending on the race. Again, zero example of the type of conduit bribery that they're concerned about. And Justice Sotomayor says that's because Colorado 2 exists. That's because we have a law. Colorado 2 doesn't apply in the 28 states that impose no limits. It doesn't apply with respect to the 2014 amendment. All right, I'll have Mr. Martinez respond to that. And finally, can I just ask the question about whether parties are being treated better or worse? I appreciate the concern about the changes in the way in which they are related to parties, but I understood that parties, as a result of Colorado 1, have no limits on independent expenditures and that that, in some ways, preferences them. So can you help me to understand who has the better set of rules here? Well, that certainly doesn't preference them because PACs also can engage in independent spending. And in addition, PACs aren't faced with the base limits that we're faced with. They can take billion-dollar contributions. We can take a $44,000 contribution. So to me, the real difference, though, between other private entities and the political parties is the theory of corruption. And your answer to Justice Kagan with respect to why, if we agree with you, this isn't going to be limited to parties, why is this going to be limited to parties? Sure. What was the answer to that? And that's what I was just getting at. It's the theory of corruption. The concern with a lot of private entities, individuals, super PACs, is that they are going to directly bribe the candidate. They are going to go to the candidate and say, I will spend $100,000 on your behalf, $1 million, $10 million, if you do my ____. But parties don't have that same theory. That's not even their theory. Nobody is asserting that a party is bribing its candidates. When the DNC goes to Senate ____. No, in both cases, the theory is that the donor is using either a party or a PAC, this is the theory, to effectuate this quid pro quo. So why would it make a difference that a donor who wants to do that is going through a PAC versus a party? I don't think that's necessarily the theory for PACs. I think the AFL-CIOs PAC, the Amazon.com PAC, the corporate PAC. In my hypothetical, if the donor is trying to bribe the candidate and because of the contribution limits on direct contributions, it says I'm going to do this through a conduit scheme, I'm just trying to understand the difference between giving money to a party and having it funneled to the candidate that way versus giving money to a PAC. Is there a difference? Yes, I do think there's a difference. There are a couple of differences. The first is that in the private context, you often do have a unity of interest between the donor and the PAC. When the AFL-CIO creates the AFL-CIO PAC in order to further its own interests, I think the risk is really less that the AFL-CIO is going to funnel money through the PAC to the candidate. The risk is that the AFL-CIO PAC is going to directly bribe the candidate. When it comes to political parties, nobody thinks that if the DNC says to Democratic Senate candidates, I will only support you if you oppose the Republican tax bill. Nobody thinks that that is a bribe, whereas if a private PAC went to a candidate and tried to extract the same promise, I think a lot of people would think, yes, that's a bribe. That's why my friend's theory depends on this type of conduit bribery scheme using the party as its mule, which this court in McCutcheon said is unlikely to work, prevented by other things, and unnecessary given the rise in super PACs. Thank you, Counsel. Ms. Harris? Mr. Chief Justice, I may please the Court. Limits on party-coordinated expenditures unconstitutionally restrict core election speech. Intervening developments have demolished Colorado II's contrary holding. Indeed, even under closely drawn scrutiny, this Court's recent cases dictate invalidation for many reasons. First, these limits do not serve the only valid interest of preventing quid pro quo corruption or its appearance. Parties can't corrupt candidates, and no evidence suggests donors launder bribes by co-opting parties' coordinated spending with candidates. Second, there is a fatal mismatch between any anti-corruption interest and Congress's exception-riddled limits on party-coordinated expenditures, which would be a nonsensically convoluted means of thwarting donor corruption. And third, alternatives like FECA's disclosure regime and earmarking rules already check quid pro quos and are operating more effectively today. I welcome the Court's questions. Ms. Harris, in your reply brief, you say that the FEC would continue to enforce its rules, but how do they do that when the government argues that the rules are unconstitutional? Yes, we have not disclaimed enforcement, and it's the same way that the government has done so in cases such as Windsor and cases such as Chateau. The government and executive branch has traditionally distinguished between declining to defend the constitutionality of a statute and continuing to enforce it, particularly in situations like here where enforcement is something that preserves judicial review. Now, you don't even have to agree with that proposition. You can cast doubt on government enforcement if you wish. The reason this case is easy on that score for jurisdictional purposes is that FECA also has a private enforcement mechanism, and it is abundantly clear that there is a very credible risk of enforcement through that private mechanism because many parties avail themselves of it. There's a rich sort of D.C. Circuit jurisprudence on how this happens. So, again, for mootness, the other side would need to establish that there is no possible credible threat of enforcement either way. I really don't think they can do that. Now, again, I think the jurisdictional issues are prelude to the merits, and on the merits we just don't see anything left of Colorado II's standing. That is why the government is here not defending Colorado II and not defending this particular law, and that is for multiple reasons. I think if you just look at the theory of undue influence upon which Colorado rested, that's probably the cleanest holding in this case. There is no way that you can look at Colorado II and say it rested on the theory that we've all been talking about now, which is preventing circumvention of quid pro quo corruption or its appearance. Colorado II is rife with references instead to a theory that there might be undue influence if donors decide to try to evade campaign finance restrictions so that they can concentrate on having large donors at the expense of attracting many donors. That is not a theory of quid pro quo corruption that this Court is on. Counsel, I find it difficult to accept your theory that Colorado II rested on the undue influence rationale. It certainly described our prior cases as doing so, but when it was talking about the coordinated expenditure rule, it specifically referenced that it was to prevent quid pro quo corruption. So I think it's an unfair assessment of Colorado II to say that one of its underlying pins was knocked down in some way or has been knocked down, because it didn't rely on that. Two responses. One, I think it's very telling that the Court in both McConnell and also McCutcheon, in particular the McCutcheon dissenters, said Colorado II stands for the proposition that undue influence is a valid theory of governmental interest, and that is something that the Court McCutcheon rejected.  But it wasn't what it relied upon for its anti-corruption rationale. Respectfully. That's why it went through the earmarking rules. That's why it went through the disclosure rules. And in both instances, all the arguments you're making today, it rejected. It said earmarking wasn't enough. And even with the federal changes with respect to earmarking, the nods and winks that Justice Kavanaugh pointed to don't even need to be accepted as a possibility. We know that candidates in the past have asked donors to donate to the Republican, not the Republican, to a party as opposed to themselves, knowing that the party was going to spend the money on them. It's just all too easy to see that coordinated expenditures is just a different way of having the party contribute to the candidate. So two responses. First of all, with respect to Colorado II and why it really does rely on undue influence. And second, with respect to earmarking. Colorado II. I will point to you multiple parts of Colorado II. I would start with page 456, footnote 11, where the court talks about combating circumvention of contribution limits designed to combat the corrupting influence of large contributions to candidates from individuals. Or page 460, where Colorado II is focused on the idea that a candidate enjoying the patronage of affluent contributors would have a strong incentive to promote circumvention as a step towards reducing the number of donors requiring time-consuming cultivation. Or I'd point you to Colorado I, where the court recognizes that the whole point of the restrictions was to prevent certain amounts from being spent for certain offices in certain states. Now, we can sort of, and I think that's why this court has characterized Colorado II as resting on that basis. Earmarking. I think that just reflects... If I could just, Ms. Harris, I mean, you know, Colorado II has both, because in that period, it wasn't only quid pro quo corruption. So there's certainly language that you can pick out from Colorado II in the way you just did. It goes beyond quid pro quo corruption, but there's no question that it was talking about quid pro quo corruption as well. You know, the risk of coordinated expenditures was that they could be as useful to the candidate as cash and thus could be given as quid pro quo for improper commitments from the candidates. That was a very important part of Colorado II. As useful as cash could be given as a quid pro quo. Again, the problem with that is that we are now in a world of McCutcheon where the reason why Colorado II may have even mentioned that theory was not something that was borne out by the evidence it was talking about. It just said, we will defer to Congress on this. We will not look for evidence. We will not look for narrow tailoring. We won't look for substantiation. And even if I agreed with that characterization of Colorado II, which I don't, I think it really is about undue influence and you can't just separate that part out. The problem is we also now have an evidentiary record and a series of amendments that completely demolish the idea that what Congress is trying to do here is ferret out quid pro quo. That's not something that focuses on what Colorado II was based on. That's the question of whether something has changed after Colorado II. And I guess I don't really quite understand your argument that it has. Okay, well, I would guess three levels of this. One is doctrinally, because that's the first problem with Colorado II. I think Colorado II, when it's looking at tallying and other things, even if I thought you, are we talking about quid pro quo? Are we talking about something else? I think it's undue influence. We disagree. You still are in a world where Colorado II, cited by McConnell as an example of super duper deference to Congress where there's no narrow tailoring. Doctrinally, that's been thrown out. That is incompatible with McCutcheon and Cruz, where this Court says, no, narrow tailoring is actually exacting. Rigorous requires legislative findings. So those don't have their own evidence. I sort of spot you that, that there has to be some kind of tailoring that, you know, whether Colorado II, I don't think Colorado II is inconsistent with that, that we certainly have as a function of McCutcheon and Cruz that the restriction has to be connected, has to have like a means end connection to the circumvention interests. So I'll spot you that one. I don't think that this has any difficulty meeting that one. And I think the difficulties are rampant and the exception scheme that Congress has designed shows why. If you're looking at a fair doubt quid pro quo corruption, the idea that you think that people in Wyoming are more corrupt than people in California and need to be subject to like 10 times less the limits for races, cannot be explained by some sense of detecting quid pro quo corruption, not least because there's no evidence of it. If you think that there's a real incentive for donors to use party-coordinated expenditures, co-opt the party, break a lot of campaign finance rules that are criminal penalties in the meantime, just to pass through a bribe, you would certainly wonder why Congress would then create a gaping hole in the scheme in 2014 by saying that the one thing where you can accept three times the normal contributions to parties and one of the things where you can have unlimited party-coordinated spendings is in recounts and in election litigation, which is like ground zero for extremely high-stakes election disposal situations. And then you also can't explain the state limits. Why is it that state committees, but not national committees, can do unlimited party-coordinated spending on get-out-the-vote efforts and everything else? Nothing in this scheme in any way matches some sort of quid pro quo interest, and that's only, again, first-level mismatch. Then we get to the evidence, the state evidence, that the petitioner has talked about with respect to the 28 states in which there are no limits on party-coordinated contributions, expenditures, is very telling because, again, of those 28, you can even look for like a but-for world of what would happen in this case if you didn't have this one limit. That but-for world exists in Arizona and West Virginia. Those states have very similar schemes to the federal scheme. They just don't have party-coordinated expenditure limits, and there's no evidence from those states that this guy has fallen, that there's rampant quid pro quo being passed or anything else. So you can do it as a mismatch problem with this law. You can do it as a lack-of-evidence problem with this law. Under the framework of McCutcheon, it just doesn't work, and that explains our position in this case. Are limits on outside groups' coordinated expenditures constitutional? We don't have a position on that, and we think they're easily distinguishable, and here's why. The real problem with party-coordinated expenditures, and the reason why I think this case comes in with built-in limits even more so than a case like McCutcheon, is that the encroachment here is upon 200 years of history that preceded FECA where parties and candidates were engaged in joint activity all the time. Parties actually ran the campaigns. Parties and candidates have a unique confluence of influence and interest, which is both why there's no possibility that a party would itself bribe a candidate and also explains why it's different from these other actors. As a petitioner's counsel noted, there may well be a risk that individual donors or individual PACs might try to engage in a bribe scheme through coordinated expenditures with a candidate. That might differentiate this case where no one is arguing, not even Colorado II accepted the proposition, that the party itself is a source of potential, quote-unquote. Rather, it's the indirectness of the scheme, and I think that limits it out, and I also think the greater First Amendment interest of a party coordinating with a candidate whose, you know, standard bearer is the candidate and engaging in fundamental communications about how to time campaign ads, how to spend scarce resources, how best to get across the party's message, what deviations are acceptable is fundamentally different. It's an integral part of our democracy. Are limits on contributions to parties constitutional in the government's view? We aren't saying that they're unconstitutional, and we also think they are distinguishable for some of the reasons I talked about. One is the distinction in the First Amendment values in this particular scheme, which is party coordinated expenditures involve joint speech, joint strategizing. The party can say no to spending on particular things that thinks the candidate is not running the campaign right, and ways that just cutting a check don't do. And second of all, if you want to limit out contributions to parties and preserve limiting principles, we're back to the way that this law works. Unlike contribution limits, which are just you can't spend more than $5,000 for anyone, this scheme has a welter of completely bizarre exceptions that really exacerbate any mismatch. Do you think it was constitutional before 2014? No, but I think it was. Ms. Harris, I'm sorry. Keep going. I'm sorry. I think it's even more obviously unconstitutional after 2014. I guess I'm still not clear on the first question that Justice Kavanaugh just asked you, which was to the extent that we have donations being made to parties and donations being made to PACs, if the theory is not that either the party or the PAC itself is the one who's trying to bribe the candidate, if the theory is that the donor is trying to bribe the candidate through this conduit, why are parties different than PACs? So parties are different than PACs, and I don't mean to resist the hypothetical, but I think it's important. PACs themselves can also be the source of the bribery. They can also. Fine. But we have a lovely PAC who's not trying to bribe the candidate. We have a lovely party that's not trying to bribe the candidate. We have a malicious donor who is trying to bribe the candidate, and because of the limits on their ability to give campaign contributions directly, they would like to use a conduit. What I don't understand is what difference it makes that it's a party or a PAC in that circumstance. Okay, so bracketing the PAC bribery hypothetical, I still think parties are different, and one of the reasons is historical, which explains the unique identity of interest between the candidate and the party that differentiates PACs. The reason why the sort of party coordination is in some ways a bulwark against the donor circumvention scheme is that parties exist to get the candidate elected. Parties do not want to spend money in ways that squander electability of candidates. Parties are insulated from that because they have the candidate peers on the ballot as the party's name. And that's part of a rich history of parties and candidates being completely entangled. It's a very different history than any other outside group. And again, that's not just for purposes of donor circumvention in which there are real reasons why parties in particular will be reluctant to embark upon this campaign finance violating scheme, but also the fact that PACs, as Petitioner's Council noted, are in fact often aligned with donors in ways that don't correspond to parties. So the ASL-CIO PAC and the ASL-CIO donor example is a good one. Thank you. Thank you, Counsel. Justice Thomas? Justice Alito? One of the reasons for heightened scrutiny is to ferret out whether the asserted reason for a challenged law or provision is actually the real reason for the provision. And I would appreciate it if you would just say a few words about what can be inferred about the real reason for the provision at issue here from the various exceptions and limitations and the differences in the amount that can be contributed of coordinated expenses that are allowed in most House districts and in those where the candidate runs at large in the state. Yes. We think the design of that scheme completely refutes any quid pro quo interest and reveals, as Colorado One singled, that the real interest is in trying to have Congress and its incumbents prescribe how much money is appropriate in particular context, how much money should be spent in particular election context. I think that Senate limits are the best example of that. They vary in amount. They're keyed not to some sense of corruption but to state population, which is a proxy for perhaps how much a media market would cost or how much an election would cost to run. So again, you have a situation where in Wyoming, the party contribution limit is like under $125,000, whereas in California, because of the state population differential, it's like $3.3 million. And that cannot be explained by some sense that people in Wyoming are more corrupt than people in California, or even that that is an appropriate amount to spend on races, given that a lot of Senate campaigns take place in smaller states, say in Montana, that might decide control of the Senate. So it's very difficult to discern any quid pro quo rationale from that. And on top of that, the other exceptions, I think, underscore the problem, the state limits that I mentioned with respect to having exemptions for get-out-the-vote efforts or bumper stickers. If there's any difference in corrupting potential when a donor decides it wants to somehow ferry through a quid pro quo scheme because there's unlimited money on bumper stickers versus something else, no one has pointed to one. And we've sort of thoroughly canvassed the national exceptions as well for recounts and litigation. They just, in no sane world are those keyed to some sort of concern with quid pro quos. The only reasonable explanation is they're keyed to judgments, impermissible judgments, about how much money is appropriate to spend on particular forms of campaigning or election speech in particular kinds of states. Thank you. Justice O'Meara? We no longer have expenditure limits, so there isn't any judgment as a courtesy of this court. So there no longer is a judgment about how much is appropriate on expenditure limits. What is at issue is a very discrete issue of how much is appropriate to avoid the appearance of corruption with respect to contributions. Now, you said something to Justice Kavanaugh that I want to underscore. Your brief and Respondent Petitioner's brief spent a lot of time explaining why Colorado 2 should be overruled because of the changes in the 2014 law. You disavowed that. You think the law was unconstitutional without those changes, correct? I think, yes. I think it was the doctrinal changes in this court's jurisprudence would be alone sufficient. I think this is just an easy case because you could say those intervening changes in the doctrine of the amendment.  Before the change that permits national convention support came in the wake of eliminating public funding of conventions. So it's a way to make that up. With respect to the party headquarters, headquarters, once they're built, are not tied to any particular candidate, so there's not a problem. With respect to ballot counting, the election has already happened. That was the whole Cruz case premise, which is how can there be a quid pro quo corruption after an election? I dissented there. Nevertheless, that's the court's holding, so why would it rely on that change here? With respect to the issue of donation for party headquarters, that was part of the FEC regulations long before the 2014 elections. So I think you were wise to give up those changes as a ground for saying this law is unconstitutional. What you have to rely on is saying that McCutcheon and Citizens United and Cruz changed the legal landscape, correct? To be very clear, I'm relying on both. I think certainly the doctrinal changes alone will be sufficient. The reason I think the 2014 amendments are important is I think taking a blinkered look at the import of being able to have unlimited party coordinated expenditures on not only election recounts but litigation over the election is a pretty big deal. The election hasn't been called at that point. That's actually the heat of the moment in the election when one might think... But you can't change the voting. Now, can I go back to that point? Whether it was McCutcheon, Cruz, or Cruz, both cases relied in large measure on the lack of coordinated contribution limits. And you are trying to take that central part of our precedent out of the equation now. So just to push back, I don't think both of those precedents treated the party coordinated expenditure limits as the only thing preventing a different result in those cases. Quite the contrary. What the court said in particular in McCutcheon, it mentioned the party coordinated expenditure limits almost as an aside. What was far more important in that case, and again, the reason we're in a multiple prophylaxis, unprophylaxis universe here, is the court was also talking about the increased efficacy of earmarking regulations, went on for quite some time with respect to how that was something not even considered in McConnell, let alone in Buckley, as well as the enhanced disclosure requirements and the fact that with a click of the mouse, you can now see exactly whether there is some grounds to be suspicious of quid pro quos going on because of otherwise irrational donor behavior. So no, I don't think the party coordinated expenditures were treated as the be-all and end-all, keeping those schemes from otherwise being unconstitutional. Those earmarking rules, if you look at the crew amicus, you will know that they weren't completely effective in stopping the earmarking that occurred in that case. Respectfully, I think that is just an effort to relegate what McCutcheon looked at and what McCutcheon said, which is that the breadth of earmarking refuted the observation in Colorado, too, that earmarks are just... In McCutcheon, we were looking at expenditures. We were not looking at contributions. And that's what the crew amicus brief example is talking about. McCutcheon was a case about the aggregate contribution limits. And again, the court said that earmarking restrictions had grown more efficacious over time because the FEC significantly broadened them, and you have to run the risk of very significant penalties if you use earmarking to circumvent contribution limits. Mr. King? Justice Gorsuch? Ms. Kavanaugh? Should we be concerned about the overall architecture of our jurisprudence having weakened or disadvantaged political parties as compared to outside groups? I think you should be concerned with that. I think the even greater concern beyond the disadvantaged political parties that was wrought when FECA sort of overturned over a century's worth of uninhibited coordination between parties and candidates is just the seesawing of the court's jurisprudence that would happen if Colorado II remained an outlier and remained in place to sow mischief. So I think it's twofold. It's, one, the practical consequences for parties and truly core election speech, and, two, what it means for the sweep of this court's jurisprudence in this incredibly important area. And I think respondents or intervener raises questions about whether a ruling in petitioner's favor here really would strengthen parties or actually would weaken parties. They have some arguments that a ruling in petitioner's favor would actually weaken parties qua parties. Do you have a response to that? I guess the vantage from which we're looking at it is the First Amendment vantage in the first instance. Regardless of how this works out in terms of who gets more money when and who does what with the money, the bigger issue is, is there a restriction right now that is encroaching on truly central campaign speech? And the answer to us is manifestly yes. And the answer is to allow the First Amendment to do its work so that parties can engage in this coordination with candidates and heartland issues for campaigns and let the chips fall where they may in terms of other things. We don't think this is some, a restriction on what parties historically did is some special benefit to them. Thank you. Justice Jackson? Of course, whether or not the restriction is truly encroaching on First Amendment values depends on the application of the test and the extent to which the government has a good legitimate reason and is narrowly tailored in its approach, right? So it's not just, is this about speech? We have tests that apply. And I think that's what we're trying to ferret out. So let me just ask you about the emphasis in your brief that suggests that the parties are special. I'm sort of back to this. And are entitled to special First Amendment protection. So are you prepared to say here that other entities, including state committees, PACs, super PACs, won't get or aren't entitled to the same treatment as parties? We're saying they're different. And we're saying that's grounded in this Court's cases in important ways. We're not asking for a special First Amendment rule for parties. What we're saying is the history of parties' coordination with candidates and the manner in which they coordinate with candidates puts them on different footing, both in terms of the particular First Amendment interests we're talking about here, which go to heartland issues of how does a party who's selected its candidate through its own primary process and has a very special interest in ensuring that the candidate's used to the platform, translate that into actions in a campaign, and also the lack of a comparable quid pro quo interest. So, yes, they're special in that sense, but it's not a sort of special constitutional rule. It's just a practical rule that reflects just the relationship in practice. And one that we could rely on when the super PACs come next, if this... That is an important... I think that is a limiting principle that makes this case unique, along with the fact that this restriction, unlike other ones you might see, isn't just a uniform, you know, X number of dollars for everyone restriction. Are there limits right now on party-to-candidate contributions? There are, right? Yes, there are limits on party-to-candidate contributions. Parties can donate $5,000 with a curlicue, some exceptions for certain. And so are those limits also at risk, based on the arguments that you're making here today? I don't think so. I think you could tab on those in a couple of different ways. And, again, the two I would offer you, if this is a concern, one is that the coordinated expenditures involve different First Amendment and heightened First Amendment restrictions. Again, they're prohibiting the interchange of campaign strategy. But I thought we said coordinated... This goes back to the Chief Justice's very first question, that coordinated expenditures are like contributions. So if we have limits on party contributions, I don't understand the distinction. Okay, so I think it is correct, and Colorado, too, recognizes, they're the same for one purpose, which is from the vantage of the candidate's bottom line financing. You can say, if the party pays for it, or if the candidate gets money to pay for it, it's the same sort of pocketbook outcome. But I think there's a world of difference, and the court's cases recognize this, even Buckley, in saying the contribution, the First Amendment value of a contribution is simply an expression of support that doesn't come with any sort of input on the campaign or anything else. That just is not true for party-coordinated expenditures, even if we're talking about the sort of simple hypothetical of bill paying and setting aside coordinating on an advertising campaign about how the platform should be communicated. So that's the first distinction. But if you're... It's a different message. Is that what you're saying? I think it's just a different level of First Amendment communications. So it's above and beyond an expression of support, yes, and in ways that I think implicate even more heartland concerns about elections. Again, you can put that aside. You could not want to make that distinction. That's fine. I think the second distinction is what I said before, which is contribution limits are like $5,000 or $1,000, or whatever it is, they're flat. That differentiates contribution limits from the acute mismatch in this case, which inheres in the fact that this scheme, the exceptions in the scheme, cannot be matched to a quid pro quo interest precisely because they're variable. They vary based on population. Very complicated, very variable. It's not just complicated. I think it is. They're not key to quid pro quos in ways that you could argue that contribution limits that are flat might be different. And I think that's why the way this court's protected sort of against the dominoes is the McCutcheon framework. You have to look at each case at each restriction. Is it trying to advance a quid pro quo corruption interest or not? And how is it tailored? How is that particular law tailored to advancing that interest? Is there specific evidence? There might be different evidence, not the 28 states we have here, but some other evidence if and when the court is called upon to address those other limits. Thank you. Thank you, counsel. Mr. Martinez? Mr. Chief Justice, and may it please the court, petitioners have made very clear this morning that they're trying to ask you to overturn not just Colorado II, but really 50 years of campaign finance law. This is a highly politicized case, and I think the first place to start is with jurisdiction. No petitioner here is properly before the court. When Mr. Francisco was asked about that question, he went right to Vice President Vance. So I'd like to talk about why Vice President Vance's claim is moot, and there are two reasons. First, Vice President Vance has repeatedly denied having any concrete plan to run for office in 2028. Petitioners say that uncertainty is enough to prevent mootness. That's wrong as a matter of law. The heightened test for mootness that they invoke only applies when the mootness doctrine is being invoked to potentially manipulate the judicial system. Usually it's a defendant. Sometimes it's a respondent, and usually that person is voluntarily stopping the conduct that triggers the injury. You made all this clear in your 2001 city news case, which is really on all fours here. There's no manipulation of the facts in this case, so Vice President Vance's claim is moot unless he has a concrete plan to run. Does he? Well, his public statements repeatedly over and over and over the course of the past year, including in new comments that were reported this morning by NBC News, show that he has no concrete plan. If any other plaintiff in this court told you that his injury is speculative, that it's uncertain, that it's premature, that it might happen and it might not happen, they wouldn't have a prayer under Article III. The same rules apply to the Vice President. There's no politician exception to Article III. Even if you disagreed with me about Vice President Vance's standing because of his concrete plan to run, there's also the absence of any real world credible enforcement threat. The executive order bars the FEC from enforcing the law. No one thinks President Trump is going to enforce this law and target his own Vice President, and the Solicitor General's suggestion that private parties are the ones to worry about runs headlong into whole women's health where you said that the threat of private party enforcement cannot create Article III jurisdiction. I'd love to talk about the merits as well and the radical nature of the arguments we heard this morning, but I also welcome the court's questions. Well, before you do that, would you address the committees also? Absolutely. I think the committees are an easier case for us because the committees lack any ability. They had no statutory right to get out of the district court in the first place. There's a federal statute that governs who is allowed to take advantage of the expedited procedures, and that's Section 30110. It allows only three entities to go up in an expedited posture for mandatory en banc interlocutory review, the FEC, eligible voters, and the National Committee of the Political Party. The National Committee of the Political Party does not include the NRSC. You said that expressly in the DSCC case. You literally said that expressly after much discussion of the issue at oral argument. More importantly, the text of the statute doesn't allow it. FECA has a statutory definition that defines the term National Committee, and it unambiguously refers only to, in this context, the RNC. It's not a surprise, given what I just said, that my friend on the other side did not address the text of the statutory definition until page 10 and a half of his second reply brief in this case. They have no textual argument. Now what he said was he's got a textual argument based on an amendment that happened 50 years later in 2002. Well, that doesn't work either. The statutory amendment that he's talking about only did not purport to override the definition. It didn't purport to override the DSCC case. So I think it's telling that when my friend got up and he was asked about the committees, he said,  let's talk about Vance, because he thinks Vance is really the only way to get there. The committees also have other problems, too. The enforcement issue is equally as strong as to the committees, and the committees can only have standing here if they actually have rights under this law, which they don't, because they need to rely on an invalid assignment regulation that doesn't survive Loper-Bright. Mr. Martinez, if the Vice President came to you and, like, I want legal advice on whether or not I can violate these limits, because I've heard that somebody said, don't worry about it. They're not going to be enforced. Would you tell him to go ahead? Or maybe one thing would you tell him to do is we ought to be careful because maybe somebody else will be in the White House next term, and they may decide that prosecuting this, what is a violation, makes sense. Here's what I would tell him, Mr. Chief Justice. I would tell him that Congress has envisioned this exact scenario, and Congress has created in Section 30108 of FECA, a specific procedure by which any person can go to the FEC and request an advisory opinion about whether their conduct is lawful. And if the FEC says,  it's lawful, as they obviously would hear because they think the conduct is lawful, then there is a statutory safe harbor that would provide total relief, total protection to the Vice President from any enforcement action or any prosecution. Is that true with respect to private enforcement actions? I don't know whether it's true with respect to private enforcement actions, but Your Honor, in Whole Woman's Health, this court made very clear that private enforcement actions are not a basis to recognize a case against the government. And I think, and I'd have to go back and look, but I imagine that the safe harbor would apply just as equally to private enforcement actions because otherwise what would be the value of having the safe harbor? But I concede I haven't looked at that question.  that was kind of the point of the question. So you would tell him, don't worry about a thing, go ahead. Well, I would tell him there's a statutory mechanism to take advantage of, and I don't see why they couldn't have done that. If they had done that on, you know, when the administration came into power, the President is in control of the executive branch. We heard about that yesterday. I think the FEC would have taken the position it's taken now. They would have given him an advisory opinion, no problem, but they don't want that. They want an advisory opinion, not from the FEC. They want an advisory opinion from this court. And that's why they're coming to this court with a bunch of plaintiffs who either don't have statutory jurisdiction or, or don't have standing. But Mr. Chief Justice, let me just add to that. Let's say the vice president said, I don't want an advisory opinion. Tell me what you think. Is this actually going to happen? Is it going to be enforced against me? I would tell him there are three layers of speculation that you have to get through. And it's highly unlikely that even a future FEC would change position and come after you. Number one, they'd have to change their view on the constitutional question. Number two, more importantly, they would have to do something that the DC circuit has unanimously en  said is not allowed and violates rule of law 101. They would have to file a enforcement action, a targeting past conduct that occurred at a time when the FEC said the conduct was lawful. The PHH case, unanimous en banc decision, ratifying the panel decision, which cited seven precedents of this court that said that's rule of law. One-on-one that's a total due process. Well, I can recall a few occasions on which we have overruled en banc decisions from the DC circuit. So I don't know if that's enough of an assurance to with speech issues at stake to say that the case is moot. I think that the best assurance I can give you is the advisory opinion process. I'm aware that the administration in analogous circumstances involving other decisions of this court and other precedents has been given, giving letters of assurances to individuals confirming that they believe that certain conduct, even when it's not allowed by statute is constitutional. I think that would be yet another layer of protection in addition to the statutory safe harbor. But I just think as a realistic matter, an FEC that comes in, even if it wants to change position on the constitutional question is not going to violate rule of law one-on-one by saying, we're going to go target a bunch of people who were doing things that we said was allowed. I just don't think that's a realistic concern here. And so if vice president Vance had that question, I would say we've got statutory mechanisms in place to protect you. Let's take advantage of those. We can go to the administration, which by the way, you're the number two official in and ask for an assurance letter. In addition, as a real world matter, it's super unlikely that the FEC is going to violate unanimous decision by the DC circuit, which was written by the way, by a member of this court and, and go ahead and start violating due process by prosecuting people for conduct that the agency was said was allowed. It's just not realistic. I don't, if we want to keep going on this, I was going to turn to the merits, but can you address McCutcheon squarely? Cause that's, that's obviously been the emphasis on the other sides that McCutcheon changed the landscape from Colorado Republican. Sure. I don't think McCutcheon changed it at all. In fact, I think McCutcheon expressly relied on this provision as a basis to reach the holding in McCutcheon. And I think what, I think what this highlights is what's really going on here. And we've heard it in justice, Kevin, on your questions, your colloquy with Mr. Francisco, they are setting up bait and switch 2.0 bait and switch 1.0 was McCutcheon. They came in and said to McCutcheon,  we need to get rid of these aggregate limits. Why? Because we've got all these other protections. Look, coordinated expenditures are limited too. And then you said, okay,  fine, we'll do that. And you put it in your opinion that coordinated expenditures was, was going to protect us. Now they're coming back and saying, hot, just kidding. Actually, the coordinated expenditure expenditure provision is unlawful as well. And why do you not need to worry? Well, we've got these other limits, but then you ask them justice cabinet, you say, well, do you think those other limits are constitutional? And they say, well, we're not so sure we're not going to take a position. Well, they did say the bribery laws, right? The disclosure laws. Those are the two. And I think earmarking, although that was a little questionable, but I think those three were the three that said, I heard two, I heard bribery and disclosure. And I think that gives away the game because what's really going on here. And assume it's three. So assume it's bribery, disclosure, and earmarking. Why is that? Okay. So bribery,  and earmarking, you know what that leaves out all of the other, like 50 pages of laws in FICA, which you have considered over 50 years, you've upheld them decision after decision after decision. And I think when Mr. Frank Francisco's position is, and I think I'm glad he laid it out. This wolf comes as a wolf. He has basically told you that they're going to keep litigating to knock down every single one of the restrictions. And that includes the limits on donors to candidates directly. But just listen to how the donor candidate limit is going to be undermined. I didn't hear that. Well, he said that the only two prophylaxes you need are bribery and disclosure and maybe earmarks. Well, donors. I mean, we were talking about parties. Here's how you get to the same place. Justice Kavanaugh, if you, if you rule for them here, OK, what's going to happen right now, there are two limits that apply the donor to party and then the party to candidate. So we're essentially going to get rid of the second one because coordinated expenditures are going to be unlimited. That limit goes away. Then you ask him, well, what about the first limit donor to party? He said, oh, we're not taking a position and wink wink. You know, he said, don't be blind to reality. The reality is they're going to be coming back and asking you to overturn that. And that the logic that they're asking you to embrace here is going to mean that that provision falls to. So what's that going to leave? It's going to leave the donor with the ability to give infinite money to the party, which the solicitor general tells you is inextricably intertwined with the candidate. And then the party can make unlimited coordinated expenditures, which, by the way, aren't just about speech. It's paying the electric bill. It's paying the florist bill. It's paying the pizza bill. It's any expense that the campaign wants. What about the idea that the parties are, I've said this multiple times, but the parties have been weakened overall. And this case is at least, I think Mr. Francisco said, starts to restore the strength of parties, although obviously it doesn't get them all the way there in competing with outside groups. Look, I think if that were really concerned, their concern, what they could have done is file a very different type of challenge. And if the problem is,  super PACs have too much ability, then what they should have done is a real concern. I think that if that were their real concern, do you think that's a real concern? The parties are very much weakened. Weakened and disadvantaged compared to the outside groups. At least that's, I think, I think the answer to that concern is to say that parties should be able to get unlimited contributions, but only so long as that money is used for their independent expenditures that were blessed in Colorado one. I think that's a solution that's rational. That's consistent with the general framework, with the distinction between expenditures and contribution limits. And it doesn't require unrolling and unraveling 50 years of campaign finance law. That's not what they asked for. And they didn't ask for it for a reason, because what they're really aiming at, what they're really aiming at is all the other laws that they want to take down. This is like the camel's nose under the tent. If you agree with them in this case, you're going to get petition after petition coming to you for this provision and that provision, and this, overrule this precedent and that precedent. You're going to be deluged with petitions, the dominoes are going to fall, and you're going to have to reconstruct campaign finance law from the ground up. I have a better solution for you. Don't go down this path. We have a doctrine. You have a doctrine. Stare decisis. The whole purpose of the doctrine is to preserve the rule of law, to preserve the appearance and fact of the integrity of the judicial process. And it says you don't just throw out one decision when maybe you're having second thoughts about it later, especially when it's going to mess up a whole broad area of law. You can apply stare decisis if you get there. I appreciate your solicitude for petitions that we might get in the future, but you talked about speculation. That's speculative, and I did not hear Mr. Francisco say that he has a plan to attack other provisions. Maybe he does. Maybe it's predictable that he would, but we have one provision before us today, right? So don't we have to decide this case and not speculate about what might come later? Two things. I think he said don't be blind to reality. Let's not be blind to reality. Their own brief reiterates their opposition to the contribution limit, expenditure limit. It reiterates their opposition to Buckley. But you asked, Your Honor, Justice Alito, don't we have to do this? No, you don't have to do it, and the reason you don't have to do it is because this case is a walking vehicle problem. Let's imagine we had a time machine and we went back to June. All right, let's talk about the vehicle problem, and let's talk about reality. At what point, you have the vice president, or even a sitting president, who may or may not run for a second term. At what point do you think that potential candidate would be able to challenge a provision like this? And here it's not a question of standing from the outset. It's a question of whether it has been shown that the case has become moot. Right. So I think the analytical question asked is, does the candidate still have a concrete plan to run? And I think the evidence might not be— And you would say only when the candidate has a big event and announces, I'm going to run even if the candidate has raised a lot of money and has hired all sorts of consultants and— No, Your Honor. I'm not requiring that. What I'm saying is that the analytical question is when does he have a concrete plan, and then you're going to have to look to evidence in the public, in the record, et cetera, about what that plan is. And I think in a circumstance, I'll tell you when it's not satisfied. It's not satisfied when the candidate says in comments published today that a 2028 run is, quote, something that could happen, it's something that might not happen. Look at the other comments. Isn't that what potential candidates always say? Until the day when they make the announcement, that's what they always say. That's what candidates say when they're running. That's also what candidates say when they're not running. The most closely analogous candidate to the vice president, the most recent vice president who was serving a second-term president was Vice President Biden in 2013. He was saying virtually identical things to what Vice President Vance is saying now, and, of course, he did not run. So I think politicians, we all have seen politicians, they have an interest in not saying what their decision is until they have to because it keeps their name in the news. I think here, but I think this poses a really interesting and important question for the court, which is are you going to be in the business of second-guessing the public statements of politicians and plaintiffs when they're telling you essentially that they don't have standing or that their case has become moot? I mean, Vice President Vance's lawyers are basically telling you, ignore what he's saying publicly. Don't believe him. Wink, wink. Nod, nod. Don't be naive. We all know he's really running. If that were true, that the easiest thing in the world would be for this plaintiff, like any other plaintiff, could have come forward and said, I'm running, or told his lawyers, put that in the brief. Say I'm running. Say I have a concrete plan. I understand why. You're serious about any way my plan is. I'm serious, Your Honor. I'm serious that the same rules have to apply to all plaintiffs, and the fact that someone is a politician who has an interest in perhaps dissembling to the public about their plans is not a reason to relax your normal Article III standards. If the plaintiff in Lujan had come to you and said, well, you know, I did have a plan to visit the wildlife refuge to see the spotted owl, and I bought plane tickets and all that, but now I'm not so sure. I canceled the plane tickets. The plan is kind of off. I might do it. I might not do it. It's premature to know. Any other plaintiff who was saying the same things that the Vice President is saying here, you would say there's no standing, and you would say that the case has become moot. And I think the same rules should apply to everyone. Thank you, Counsel. I want a follow-up on Justice Kavanaugh's question at the outset, because I'm not sure it was answered directly. But is there any part of or language in McCutcheon with which you disagree? I do think that there are concerns I have about the empirical analysis and the predictions that were made in McCutcheon and its analysis of joint fundraising. So if I could just sort of spell that out. I think the court in McCutcheon was responding to a hypothetical that the district court had put forward and certain arguments that had been made by the parties. And the court essentially said it's just illogical, it's unrealistic to think that all this money is going to shift around in the way that's being suggested. And I think the court's opinion said something like, you know, it's crazy to think that the Iowa Republican Party is going to want to help the Senate candidate from California and send the money to the California Republican Party. And I think that's true insofar as it's limited. It's true that state parties don't often shift to another state Republican Party. But the reality is that what they do do, and this is just 100 percent objective fact that anyone could see if you go to the FEC website, is state parties don't give to each other. What they do is they send their money up to the NRCC and to the RNC. So just in 2024, for example, state parties sent almost $30 million that they collected and they sent it to the NRSC. And they didn't do it because those states had Senate races and they wanted the NRSC's help. I'm talking about the Republican Party of D.C., the Republican Party of Georgia, the Republican Party of New Hampshire, state parties that had no geographic interest in the Senate race. They sent that money up. In the presidential races, it's even more obvious. So there have been FEC proceedings looking at the joint fundraising campaigns of the Trump and Clinton campaigns from 2016. If you look at the money that the state parties received through those joint fundraising efforts, 80 percent of the money that Democratic state parties collected went to the DNC. Ninety percent plus of the money that the Republicans collected went to the RNC. So I think in McCutcheon, probably because this wasn't properly put before you, but the hypothetical was not the exact hypothetical that needed to be considered. And so the question is, are these state parties being used essentially as cash cows to kind of launder money through and get it back up to the national parties? The answer is absolutely yes. And that raises the very serious problems of pro quo corruption that I think we should all be worried about. Thank you. Justice Thomas? Justice O'Meara? You spent a lot of time on standing, more than I would have hoped. But I do want to say that whether he runs for president or Senate, how do you eliminate that if he doesn't get to run for president, that he'll run for Senate given that he has a committee with $50,000? I'm so glad you asked. So I don't think there's any realistic chance that he's running for Senate. There's a sitting Republican senator who's currently in that seat who's running for re-election. It's in 2026, and he is likely to win. I think he's likely to win. If he wins, he's going to be the sitting incumbent. It's extremely unlikely that he's running for Senate. The vice president has never said since becoming vice president that he's considering running for Senate. On the $50,000 question, look at it in context. Real Senate candidates would be way beyond $50,000. I think Mark Kelly, who's running for Senate in Arizona, has raised nine-plus million dollars. John Fetterman, who's running for Senate in 2028 in Pennsylvania, $1.2-plus million dollars. So $50,000 is actually a sign that he's not a real candidate for Senate. All right. Now let's go back to the merits. Sure. All right. Justice Kavanaugh said there are three prophylactics, the bribery statute, the ear-marking statute, and what was the third? Now I've forgotten.  Disclosure. Thank you. McCutcheon seemed to say that those were enough. Why is this different? I don't think McCutcheon said that they were enough, but I think the key thing to realize, there's some language in McCutcheon talking about conduits and independent actors. I think it's a crucial point for this Court to appreciate that there's an internal contradiction in the arguments that the Solicitor General's Office is making together with petitioners. They want you to believe two things that are diametrically opposed. On the one hand, the whole theory for giving parties special treatment and why parties can't corrupt candidates is because they are inextricably intertwined. That's the language that comes out of this Court's case law that the Solicitor General really emphasizes over and over again in their brief. The parties and the candidates are inextricably intertwined. But then we get to talk about quid pro quo corruption. What's their theory there? Their theory there is, oh, these are independent actors, totally different actors, and that's why we don't have to worry about quid pro quo corruption. Well, they can't have it both ways. If the parties are inextricably intertwined for purposes of getting special rights, they can't be totally independent actors for purposes of dismissing concerns about quid pro quo corruption. And I think that sort of gets to the heart of it. I think when you look at McCutcheon, McCutcheon relied on the validity of this provision, and I think it's perfectly fair to say that just as in McCutcheon we treated this provision as valid, we're going to continue treating it as valid in this case. What about Mr. Francesco pointed to the fact that there was no evidence of a quid pro quo involving coordination between a party and a candidate, and he points to the fact that there is no such that that coordination is permitted in 28 states. How do you address that? So I wasn't part of developing the record in this case. I just think two comments. First of all, I think that when you see it's raining out and you see there's a good reason to carry an umbrella, that's a pretty good reason to take the umbrella. You're both borrowing from my sister, Ruth Bader Ginsburg. Absolutely. And I think the Watergate evidence was directly on point. I think you raised it earlier. The dairy industry evidence showed that there was a very serious quid pro quo corruption problem where donors were using political parties to launder millions of dollars essentially to candidates in order to get bribes. So I think that justifies the law. That, frankly, should be enough. Now, the implicit premise in my friend's position is that once you have a law that's been in place for a long time that's doing good work, you have to kind of continually reevaluate it, and the way you continually reevaluate it is by looking to whether states need similar laws in their states. I just think that's a very bizarre way to think about the problem, and I think the state's brief supporting us makes that clear. Justice Kagan? Justice Gorsuch? Justice Jackson? Thank you, counsel. Mr. Wise? Mr. Chief Justice, and may it please the Court. Over the past 50 years, this Court has had opportunity to review many campaign finance laws, and it has appropriately treated many of them skeptically. But it has never wavered on one foundational pillar. Congress may limit contributions to candidates. And while the current system imposes strict limits on nearly everyone else, my clients and the NRSC and the NRCC are given a special privilege to make millions of dollars of in-kind contributions to candidates. These limits on in-kind contributions are called coordinated expenditures, but they do not pose any meaningful burden on party speech. In fact, the vast majority of them hardly involve speech at all. The practical effect of Petitioner's case would be to convert the political parties into mere paymasters to settle invoices from campaign vendors. This Court has repeatedly recognized that these are just contributions which provide only a general expression of support for candidates. Congress may regulate them. I welcome your questions. So if you say it's not speech at all, can it be totally regulated? There are no limits? Under the Buckley framework, there are still limits on regulation of contributions. This Court's decision, for example, in the Vermont limits case, said that limits could be so low. No, I mean you just said that there is no speech component to this that they can be regulated. So what's the protection if there is no speech component? So there is a speech component. What this Court said in Buckley is that the speech component is in showing support. In other words, is in making a contribution is an act of speech. And in the Sorrell case, this Court said that there was a limit to how low party limits could be that you would effectively deprive that of being able to make that speech component. My point, Justice Thomas, is that I think imagined in the ether is the sense that what's going on is that the Republican Party wants to create an ad on their platform. And they lament if only they could coordinate with a candidate, they would make this ad on their platform more effective. That would be an interesting as-applied challenge. That isn't either their facial challenge, nor reality, nor even their as-applied challenge. What the NRC and the NRCC wish to do is to simply pay the bills of campaigns. Bills that may not involve speech at all, may involve, for example, flowers, or may involve hotel blocks, and in which the party may not even know that the bill was incurred until they receive the invoice and are told to dutifully pay it. And that poses a very different profile of the kind of speech interest that is at stake here. I'm sorry, counsel. Now I'm a little confused. I thought that they are attacking coordinated expenditures and saying that they should be able to coordinate expenditures. I don't think, and Mr. Francesco, when he gets up on reply, will make this clear or not, they're not saying that coordinated expenditures means that a candidate can just give the bill to the committee. They're saying the candidate can say to the committee, do this and do that, and the committee can do it. No, your honor. Coordinated expenditures, whether they be for paid public communications like television ads, or they are for hotel blocks, or they are for the electric bill, these are invoices incurred by the campaign's vendors, payable owed by the campaign, that are simply handed off to the party committee for payment. And that is perfectly lawful. That is how coordinated party spending works. If you look at, in the record, at the Chabot ad or the Vance ad at JA 195 through 96, or 198 through 2005, you see that there are email chains in which the media vendor for the campaigns are talking to the campaign itself about the ad and talking about the changes they have made to the ad at the direction of the campaign. And then at the end of the chain, it is, here party, pay this. Now, it's maybe a little more polite than that. It may be, please pay this. But, you know, one of the questions that came up about, you know, who this benefits, and I'll be happy to address that now or later, the NRCC's membership are incumbent senators. The NRCC's membership are incumbent members of the House. Interestingly, among all of the lawyers here, none of them represent the Republican National Committee. None of them represent a state party. Sure, the RNC nominates candidates. The RNC has a platform. The NRCC does not nominate candidates. No one runs on a ballot as the NRCC's candidate. These are campaign committees. They exist like super PACs, solely to elect candidates to office. And so when an incumbent senator's campaign or a competitive senator's campaign, for example in this case in Ohio, sends a bill to the party, that's just a seat that these incumbent senators want to add to their tally, or it's a colleague of theirs who is a member of the committee whose bill they want to pay. Mr. Elias, can I ask you to maybe address Justice Alito's question to Mr. Francisco a little more directly? Mr. Francisco said that the RNC and the DNC have long been aligned on this question, and normally regulated parties are happy to get rid of regulation, and obviously this ties the DNC's hands just as much as it ties the RNC's hands. So I guess my questions are two. One is, if the parties have long been aligned on this, why change the position? And two, if there isn't an imbalance in who this benefits, why would the DNC be here? Why would your client be here if it didn't perceive this to be something that would benefit the RNC more than the DNC? So I would correct my friend. I don't believe the parties have been aligned on this interest. I think that if you go back, in fact I know since the very first brief my name ever appeared on before this court was in 1995 in Colorado I, and you look at the position of the Democratic National Committee and the Democratic Senate and Congressional Campaign Committee, they did not say that the limits should be struck down. Their brief said essentially that the definition of coordination should be narrowed, but not that the limits entirely should be struck down. And we did not file a brief in support of the Republican Party in Colorado II. So I don't think that it's correct to say that our position here has been aligned. And certainly our office holders and our members in voting in Congress and in their public statements and in the platform of the Democratic Party have not been aligned with striking down this limit. To answer the question directly, I think that the reason why there is a difference here might stem from the fact that the RNC is not in this case. I mean the fact is the Democratic National Committee spends an enormous amount of money and energy on party building, on registering people to vote in states like Indiana and Missouri when there is no competitive Senate or House election in Indiana or Missouri. And what this is going... put aside the question of the RNC and why they're not here. How is your client hurt by... how would your client be hurt if this provision were held to be unconstitutional? I assume you think so. So why? Right. So, Your Honor, what I was starting to say is that the National Committee in particular, but all of the national parties, but the National Committee in particular and state parties, they have to do party building day in, day out, year in, year out. They have to build the next generation of candidates. They have to register voters in all 50 states. There has been a lot of press about the Democratic National Committee's 50 state project and its expansion. And what that means is that you are investing your hard money, not just in the next swing state election, not just in the next competitive election, but in building for the future. What this will do is create a collective action problem that will drive the parties inevitably to just being bill payers. They will not be able to do... they will not be able to support activity that is long term in nature because there will be an arms race that right now doesn't exist. The coordinated party spending limits act as a buffer on how much money you can pump into directly paying the bills of a House or Senate campaign or a presidential campaign so that you have funds to do these other party building functions. So that's actually quite interesting because it's a different view of how these rules either help or hurt parties. So what I think you're saying is that if these limits are eliminated, that it will somehow make the parties on both sides into kind of glorified fundraisers for the candidate as opposed to putting their money and efforts into the kinds of party building activities that you would prefer to do. Yes, and I think it's no surprise that if you look at many of the states that have no limits on party coordinated expenditures, they are among the weakest parties in the country at the state level. So the rules don't disadvantage parties in that sense? No. Look, if this court wants to enact new rules that benefit parties, I've got a long list. But it would not begin or even be on the list to strike down the limits on coordinated party expenditures. I want to make a couple of other points just to clarify. Both parties will be operating under the same rules and you're saying, are you saying there will be a differential impact on the two parties or just the collective action problem and you don't want to be part of that? It's the collective action problem and I didn't mean to suggest, Justice Alito, that there's anything untoward with the RNC not being here. My point is just that the national committees bear an extra burden with respect to these party building activities that understandably the congressional committees and an individual candidate, the individual candidate just cares about the next election. Senate campaign and House campaign, they just worry about the next, winning the majority in the next election. The DNC and the RNC and state parties bear, have larger infrastructure purposes and that's why in Colorado, it was the Colorado Republican Party that was leading the charge. That's why in the Cal case, in the Fifth Circuit, it was the RNC and a candidate leading the charge. So, there are a couple of points though that I'd like to clarify. I want to let you do that, but sometimes when people talk about the weakness of parties in the current day, what they mean is the parties have no control over individual candidates, senators, House members. So, how would this affect that? If you thought that, and obviously we're not in the business of trying to figure out whether parties need help and how best to provide it, but I'm just wondering if you think that the real problem with the weakness of parties is that there's not enough party control over candidates, how does that play out? Right. So, I would answer that in two ways. The first with respect to the actual plaintiffs below, the petitioners in this case. The membership of the NRSC is the sitting caucus of the Republican senators. The membership of the Congressional Committee are members of the Republican Conference. They are part of leadership. They literally are listed in the official directory. They are elected as part of the official election of leadership in the body. I promise you, that is where their power comes from. Their power comes from the fact that they are a coalition of incumbent members of the House and Senate. It is not because of their ability to pay master more money to this candidate or that candidate that gives them power in their elections. Can I make just a couple of points? First, very small, Mr. Martinez asked if an advisory opinion binds private parties, it does. It acts as a complete shield against any liability, criminal, civil, by anyone. The second question was, there was a lot of discussion about super PACs and the relative power of super PACs versus the party committees. The key benefit that the party committee have that seems to have gone unmentioned is actually founding McConnell, which is the member of Congress can't solicit money for a super PAC in excess of $5,000. When we talk about, they would much rather have the money go to a super PAC, that may be what they privately want as an elected member of Congress or as a candidate. But candidates and office holders cannot solicit for these super PACs. It is not just that they are independent in their spending, they are actually on their own, largely, with some exceptions, which I'm happy to address in how that money is raised. With respect to the earmarking rules, there's been a lot of mention about the earmarking rules, but not a lot of discussion of it. The reason why the earmarking rules are not effective, and I think this is a bit of a change since McCutcheon, frankly, are for two reasons. The first is because joint fundraising is essentially an exception to the earmarking rules. Because, after all, if you have a joint fundraising committee between a candidate and 50 state parties, the candidate name is in the joint fundraising committee because they are a participant. So it's not illegal earmarking that someone is given to the Trump victory fund or the Hillary victory fund or the Biden victory fund. It's required by the regulation because their committee is getting the first money in that arrangement. So I think that, first of all, you have to understand that the earmarking prophylactic just doesn't have any application in the joint fundraising arena. Thank you, Counselor. Justice Thomas? Just so I'm clear, is there any First Amendment interest in coordinated expenditures? Your Honor, I think that there is an interest, a First Amendment interest, in coordinated expenditures in two regards. Number one, there is an interest any time any entity or person wishes to make a contribution to a political committee, they are expressing First Amendment speech. They are engaged in First Amendment speech. Buckley said that that is satisfied by allowing them to contribute. So, essentially, the speech is in the first dollar. It is in showing support for that candidate. And that's why the contribution limits could be $3,500. Because the donor is engaged in First Amendment activity, engaged in First Amendment speech, it is essentially symbolic speech. It's the act of giving money. So that's number one. Number two, again, I think this case would be a very different one if the as-applied challenge, first of all, if it was an as-applied challenge, but second, if it was an as-applied challenge where what the party wanted was its own speech and it wanted to coordinate that speech for the candidate. That would pose a very different case. And there would be different considerations on how that could be limited, which is why, in 1996, the brief of the Democratic Party went to what the scope of coordination was, that there should be less of a sweep of what is considered coordinated. But if you're saying is there First Amendment speech with respect to paying the bills of a campaign so that the campaign staff stayed at a hotel, it is just in the act of making the donation. It's just in the act of making the in-kind contribution. I still don't understand what you're saying. If the party coordinates with the candidate and pays the bill, is that speech or does that have a First Amendment protection or is it simply, as you say, a bill-paying exercise? It is speech. It is speech. And under Buckley, what is treated as is a contribution, and therefore, though it is speech, it is subject to limit by Congress on how much can be spent in engaging in that speech. Justice Alito? If we look at all of the limitations and the restrictions and the variable limits, how can the provision satisfy any sort of heightened scrutiny? And does that cause reason for legitimate skepticism about whether this is about circumvention at all as opposed to other things like favoring incumbents, favoring major parties, etc.? So are you talking about, for example, the 2014 new accounts? I'm talking about all of the restrictions and limitations. So I think each one of these restrictions and limitations has a constitutional, either a constitutional reason or a constitutionally motivated reason. So, for example, the 2014 accounts, something I'm very familiar with. The reason why the legal account was treated in this new law was because prior to that, there was, and remains on the books today, a regulation, 11 CFR 100.9 and 100.15, that entirely exempt recounts from the campaign finance laws. Entirely. If you go back to the Bush-Gore recount, none of that money was paid out of the hard money accounts. What happened is that after the McCain-Feingold law, after this court's decision in McConnell, there became a genuine question whether, because of the ban on national parties and candidates raising spending, directing or controlling, apologize if I missed a word there, soft money, whether those regulations were still in effect. So Congress in 2014 passed, they clarified, against a backdrop in which, by the way, many Republican elected officials were taking the position, it is still unregulated, unlimited. We don't want to take the time to go through all of these one by one. Just one more. The difference in the limit for, which was talked about, the limit in California and the limit in Wyoming. How can that be seen as based on preventing circumvention? You see this in states as well, in various state campaign finance laws. Legislatures have one of two choices or a combination. They can either say, we don't care whether you're running for insurance commissioner, county council or governor, the contribution limit is $1,000 or $5,000, whatever it is, In some states, the limits for governor are higher than the limits for county council or higher for governor than they are for legislature. And those have never been viewed as constitutionally suspect. The theory is that for some offices, it simply costs a lot more money to run a comparative campaign. And therefore, they're going to set different contribution limits from donors because they are reflecting the difference in the cost in running campaigns. I don't think that helps you to say that, unless I'm missing the point. Is the degree of risk of corruption different in those two places? They are because the fact is that it is not that the good people of Wyoming are any more likely to be corrupted than folks in California, but the value of $100,000 bill pay for a television ad in Wyoming might be a week's worth of television. In California, the value of a week's worth of bill pay for a television ad wouldn't buy you a single spot in Sacramento. Okay, I understand. Thank you. Is this on there? This is Kagan. Mr. Elias, I think some of the skepticism when you approach limits like this is, well, if we took them off, it might be a better world, it might be a worse world, who knows. But with respect to the particular thing that we're supposed to be concerned about, which is the prevention of quid pro quo corruption, it would not be a different world. That's the kind of skepticism. But with respect to that one interest, this limit just doesn't have enough connection to that interest in preventing quid pro quo corruption or preventing people from circumventing the principle quid pro quo, the contribution limits. So how would you address that? I would address it very straightforwardly. Congress passed limits that right now say that an individual can give $3,500 per election to a candidate. In reality, there are joint fundraising committees in which an individual can give over a million dollars to a committee that bears that candidate's name. Now, we can debate whether or not that creates actual quid pro quo corruption, and I do think that it is being undersold. The record there, I would point you all to the Lindberg example in the crew brief at page 1718, where an insurance company, in fact, made a $500,000 contribution to the North Carolina Republican Party and then instructed this state party to give $250,000 of it directly to the candidate, and that was prosecuted as quid pro quo bribery because, in fact, that individual wanted legislation. That took place in 2020, so I think we're underselling the actual corruption. But honestly, if an individual giving a million dollars when the base limit is $3,500, and at the same time they have business before the House or the Senate, and that individual may be a deciding or swing vote, that is a world that McCutcheon didn't envision. That is certainly a world that Buckley didn't envision. And if you take off the only prophylactic, we've heard a lot about prophylactics, the only prophylactic that is in place right now on that is the coordinated party spending limit. The only thing that is preventing the connection between that donation and the money being used to pay bills that the candidate wants paid right now is the coordinated party spending limit. And if you take that off, then frankly, I'm not sure other than the bribery law, I don't think anything is left. The earmark regulation just won't apply. So you can take that one off the table. And I hear people say, well, disclosure. I mean, honestly, I'm not even sure I understand what that means. I mean, no one in this courtroom spends more time on the FCC's disclosure database than I do. And I don't even know what it is I'm hypothetically supposed to be looking at to figure out that corruption. Sure, I see a lot of money going in. And then I guess I follow what happens on Capitol Hill. But other than that, what's that database telling me? Thank you. Justice Gorsuch, Justice Kavanaugh, Justice Jackson. Thank you, counsel. Rebuttal, Mr. Francisco. Thank you, Mr. Chief Justice. Three quick points. First, we are fine with the earmarking rule. I can't imagine we'd be here challenging the earmarking rule. Secondly, we began on jurisdiction with Vice President Vance because it's frankly indisputable that the Sixth Circuit had jurisdiction and statutory authority over Vice President Vance at the time that it ruled. He was not yet elected to the vice presidency, so he was still a sitting United States senator. Even under my friend's view, that would be within the Article III jurisdiction of the Sixth Circuit. And as a voter, he had the authority to trigger 3-0-1-10's independent cause of action. So he satisfied everything in the Sixth Circuit. Now that we're before this court, 3-0-1-1-0 simply does not apply. It does not apply in this court. What matters in this court is that you have authority under the cert statute. He's not claiming you don't. And that you have Article III jurisdiction, which you do with respect to Vice President Vance for all of the reasons discussed, and which you also have with respect to the committees. His only argument there is that the committee's authority arises from a 50-year-old regulation. Well, this court upheld that regulation in 1981. In Loper, you made clear that that regulation survives as a matter of statutory stare decisis. And in 2014, Congress ratified that regulation when it adopted exceptions to the coordinated spending limits and explicitly applied those exceptions to the congressional committees. That makes no sense unless the limits apply to the committees in the first place. My third point goes to the merits, and it goes to Justice Alito, your question. The base limits here show almost to a metaphysical certitude that the coordinated spending limits have nothing to do with quid pro quo bribery. The base limits are the same everywhere for every race. $3,500 for individuals, $500 for the party committees. That shows that Congress thinks the risk of bribery is the same everywhere, the same in Wisconsin as it is in California. Yet the coordinated spending limits range from $60,000 to $4 million, depending on the race and location. That makes no sense if what you're concerned about is bribery. Even a Senate candidate in California could be bribed for $4 million. But it makes perfect sense if what you're trying to do is limit the overall amount of money in politics. That, however, is what this Court has repeatedly said is verboten under the First Amendment. The last people who should be saying what should be spent in elections are the people who are holding power today. With respect, this Court has jurisdiction. This law is unconstitutional. We ask that you invalidate it. Thank you, Counsel. Mr. Martinez, this Court appointed you to brief and argue this case as an amicus curiae in support of the judgment below. You have ably discharged that responsibility, for which we are grateful. The case is submitted.